Good morning, counsel. Good morning. May it please the Court. John Williams on behalf of the appellant. I intend to reserve three minutes of my time for rebuttal. Keep watch on the clock. We'll try to help you. Thank you, Your Honor. I appreciate that. As the Court knows, the issue of a duty to defend is quite broad, and it's triggered if there's any potential for coverage. And a defense can be refused only if there is no conceivable theory by which the allegations in question can be within the policy language. Now, I'd like to put a finer point on the three points that would establish a duty to defend in this case. First, the beta lawsuit allegations. Second, the language of the Hartford policy itself. And third, the extrinsic facts that were either known to Hartford or would have been known given a reasonable investigation. Did you raise this theory of liability at the time of the tender of the case? Which theory is that, Your Honor? The theory you now raise to us, the theory that Hartford ought to defend under this policy? Yes. They were asked to defend. That's correct. Were they asked to defend under the Hartford policy? The claim was made to Hartford, but the tender was originally made, I believe, by defense counsel with respect to the Sunpro business. Well, the reason I ask that is because it seems to me that if I look at California law, that I have a case dead on, which is this case that would suggest that as liability is based on the facts known at the time of the tender. Correct. This is Gunderson. That's correct. 44 Cal Reporter. And so I said to myself, raising every theory I could, was there a theory of liability which was raised about this particular matter at the time of the tender, and I couldn't find it. I believe that the theory of liability was raised. It seems to me that you argue that the insurance company has a duty to investigate further, but I don't think you're arguing that you raised the theory. I think the theory was raised. I believe the only... Well, where in the tender? I mean, I'm trying to figure out. I looked at the tender. I looked at the complaint to try to figure out where it was that someone should have been on notice, that Hartford should have been on notice that it had some policy that was going to be appropriate for this particular matter. Two things that I would say. First off, I believe that the theory was raised, but the confusion was with respect to Sunpro versus the rental property business, with respect to the tender. Was there any... Was there ever anything said about the business that Hartford insures? I believe at that time, the original tender focused on Sunpro. I think that's correct. Ultimately, though... Was there ever a time when the, if you will, those that Hartford insures were raised in the facts? Well, I think Hartford understood as much, and I say that because of Hartford's rejection of the tender. If you look at the letter that's in the record when Hartford rejects a tender, they are referring specifically to the rental property business, and they go through the policy language, and they take their position that there is no coverage. So my answer would be that originally there was some confusion... No, I think... I frankly believe that if I read the complaint, and it seems to me that Hartford has a duty to look at the underlying complaint and determine if there's anything in the complaint that would go to their insurance, then if you look at the extrinsic facts outside the complaint and look at what they were given, then they have some more duty. But it seems to me your theory is that even with the complaint, and because the extrinsic facts are really not on point, that they had some duty to investigate further. Well, their duty to investigate is not limited by what defense counsel for the Redlingers tendered to them. In other words, the facts that were tendered to them. But I would point the court to... Well, but I guess that's why I was looking at Gunderson. And I was also looking at the Upper Deck Company. Those are cases where it seems that they were under no duty to investigate the claim if they find that Harper properly determined it lacked potential liability, and I'm reading from the case, under the allegations of the complaint and the extrinsic evidence. Correct. But here, what we had was Hartford understood the theory and they understood that it applied to this particular business. And I would direct the court to excerpts of Record 152, which is where the tender was refused by Hartford. So at that point, Hartford understood what the theory was, Hartford understood which insured we're talking about here. We're not talking about Sunpro, we're talking about the rental property business, we're talking about the Redlingers being insured individually. And then Hartford lays out its coverage position based on the policy language. Now... Now, let me ask you another question, which is a little bit interesting to me. It was my understanding that another insurance company, the one insuring this is Sunpro's general liability policy, did defend and pay, correct? That's correct, Your Honor. And isn't it true that that property or that insurance really insured the Cibola Court property? No, that... I believe that insurance insured... Well, I read... I mean, I'm trying to figure out from the record, but it seemed to me that the Sunpro commercial general liability policy carrier had the Cibola Court property as the property under the business. I don't believe that's the case. I think that the investigation demonstrated that the Sunpro business was conducted out of the Cibola Court property. But you don't think that there was any Cibola Court property in that insurance policy? I can't... I can't say that for sure right now, Your Honor. But there's no question that the Hartford policy did not envision Cibola Court at all and only spoke to the El Cajon property. I'm talking Idaho now, so I'm probably not saying it right. You got it right. El Cajon was right, correct. Well... Which means a box or a coffin. Right. That's right. Very good. This myth is far, far more industrious than... What this Hartford policy did was it insured the Redlingers business, the rental property business. The El Cajon, the Fletcher Parkway property is the object of that business, but that business was run out of the Cibola Court property. Now, all Hartford had to do, back to your question with respect to what did they know and what would the extrinsic facts demonstrate, all they had to do was do what Nautilus did here with respect to Sunpro and say, where do you conduct this business? Where do you conduct the rental property business? And the rental property business is conducted out of the Cibola Court property. The fact that the object of that business is this other piece of rental property, which by the way is rented to Sunpro and has some other occupancies as well, that's not the limit of where that policy applied. Understand that in addition to the business liability, the general liability, there are other coverages for that physical property in El Cajon, casualty coverages, and those are separate coverages. What we're talking about here is the liability coverage. Counsel, how do you tavern your theory? I get your point, but what you seem to be saying is that if somebody has a general liability policy for a business and that person goes anywhere and they say they normally handle that sort of thing. So say, for example, that they frequently go to Palm Springs for the weekend and they stay at the XYZ Motel and they frequently do some of their real estate business out of that. Does that mean that if a near-drowning occurs in that pool and they happen to be by the side of the pool, that they're also liable? I don't think so. I think you have to look at the specific allegations and the specific policy language. And here you had allegations that said it was the control of this Cibola Court property. Counsel, are you seriously claiming that there was any conception that when this party, tragic though it was for this little girl, when this occurred, that that had anything to do with the real estate rental business? I am. And let me tell you why. If you look at this from the pleading stage, and that's where this coverage decision has to be made, we're assuming that the causation of this incident was some conduct which Hartford said is personal. It has nothing to do with the business. But that's not what's alleged. What's alleged is it's the control, the maintenance of that property itself. To the extent that the rental property business exercises control and maintenance over that property... So you contend that just like you would have a normal policy, which of course you did in this case, the owners did, you have a normal residential property policy that's supposed to cover these kinds of things. Are you saying that in effect the business policy in this case is wholly duplicative of that residential policy because of the fact that the owners of that property also conducted real estate work in that home? Not duplicative. I think that in this situation what you have is the Red Lingers are acting in two different capacities. This is not uncommon for people to work and live in the same space. I get that. I just don't know how you distinguish. When you make your claim, I don't know how you distinguish any aspect of this policy from a regular residential policy. Why would there be any cabining of it? They're there, they're owners, they conduct a real estate business there, so whatever happens in that home, you're saying that's part of this business policy. Not necessarily. With respect to these specific allegations, let me give you four examples. What if it was the business that paid for the maintenance of the pool? What if it was one of the causative factors of this incident was there wasn't an adequate fencing around the pool? It would be a tax problem there, not an insurance problem. But for purposes of this coverage issue, what if there wasn't proper fencing and the cost for that proper fencing was paid out of the business because it maintained control? All we have here are allegations, bare allegations that say it was control, the lack of control and the lack of management and the lack of supervision on this piece of property that caused this incident to happen. And based on that, Hartford had to say at that point in time, could there be any theory, even if it isn't pled, if it's possible from these facts, because remember, we're not limited to specifically what was pled, the duty to defend is much broader than that because these allegations could be amended. Counsel, you said you wanted to save some time. I don't want to stop you, you can keep going, but if you want to save some time, maybe is this the right time to do it? I'll do so, thank you. Okay, thank you. We'll hear from opposing counsel. Good morning, your honors. May it please the court, I represent Hartford Casualty Insurance Company. And just to address some of the issues that were just being debated, this was a situation where the accident occurred at the pool and it wasn't just the pleading that Hartford had, and I think everyone recognizes that. They had the depositions of the Redlingers, which had a second by second detailed account of what the Redlingers were doing at the time of the accident. The policy requires that the liability producing event arise out of the conduct of the rental property business. And here Hartford knew definitively that it did not. Extrinsic evidence can defeat as well as support the duty to defend. So it appears that the appellant arguments are threefold. One, that the pleading triggered a duty to defend. The pleading, when you read the underlying pleading, it's just about a little girl's in the pool at the residence. There's nothing that references anything about the rental property. The second theory is that Hartford knew some extrinsic facts that triggered the duty to defend. Again, all, undisputedly, all of the extrinsic evidence that was in the possession of Hartford solely indicated that this was a purely personal event. And that's to be distinguished from the situation with Sunpro that's been debated quite a bit. Sunpro was a defendant. And not only that, there were specific theories articulated about Sunpro. And it wasn't just the theory of you operate your business out of the house, and therefore there's some connection. There were rumblings that they had put the sunblock on the kids, that they handed out the sunblock at the party. And that's the extrinsic kind of evidence that can trigger a connection between that business and the liability-producing event. So that's the difference. So then the third theory, which you specifically asked about, which is should Hartford have known. That is not the standard. The standard in all the cases are what did they know. And the cases that we cited in our brief specifically deal with that issue. For example, the Monticello case. In that case, it was a construction defect type of matter, and there was a defect list that was out there that indicated a potential defense duty. No one ever asked for that defect list. That defect list was never provided. Maybe it would have triggered a duty to defend, but the court said, you know what, the insurer did not know about that, and therefore it cannot bear on whether or not it had a defense obligation. That's where the Gunderson case comes in. Exactly. And many other cases. We've cited them all in our brief, so I won't repeat that here. But every case says the standard for the duty to defend is first you look at the pleading and you consider any extrinsic facts known to the insurer. They did that here. And there was nothing, nothing anywhere to suggest that the rental property business had anything to do with this accident until well after the judgment and well into this litigation. It wasn't until the amended complaint in the coverage litigation that that theory even got articulated. The first complaint in the bad faith coverage litigation was about reforming the policy because Hartford should have had some pro on there. Then that was abandoned. And the second theory became we operate all these businesses out of our house, including the rental property business, and therefore there should be coverage for this claim. If I disagree with you as to the duty to defend, do I just send it back to the district court on a duty to indemnify? Yes. I hope you don't find that. It seems to me that because of how the district court dealt with it, that they need to really think about the duty to indemnify because without the duty to defend, he would have concentrated then on the duty to indemnify, and they didn't, right? Right. The basis of the district court's holding on the duty to indemnify was there was no duty to defend. The judge did not reach the issue of whether or not there was a duty to indemnify separate and apart from the defense obligation. The only other comment I would make, and then if there are any further questions from the court, is that even presuming that Hartford knew or should have known that they paid some bills out of the Cibola address, the policy requires a connection. It requires that in order for the Redlingers to be insured, they're insured with respect to the conduct of the rental property business. And, again, since Hartford knew what was happening on a moment-to-moment basis from the depositions of the Redlingers, there was no connection there. So from your perspective, the insurance company received the tender, looked at the complaint, took the deposition, and reviewed all that it was required to review to get the information from the individuals who owned the residence on a, you said, second-by-second basis, to determine what happened. At that time there was no allegation that it had anything to do with the rental business. As far as you're concerned, that's the end of the story. Yes. And not only that, it wasn't only that there was no allegation, it was that the information provided indicated the complete opposite, that it was purely personal. Mrs. Redlinger was sitting by the pool talking to another mother, and Mr. Redlinger was at church. So no one's in the office taking phone calls or doing anything with respect to the rental property business at the time of the accident. But we're really not dealing only with the depositions. We're also dealing with the correspondence Redlinger's counsel sent to Harford. We're talking about another letter that Harford got informing it of the activities that Suncro performs at the Spola property, which was on October 8, 2007. I just wanted to make sure that I had all of the evidence that Harford had, and I guess we do. Because it isn't just the depositions. I agree, Your Honor. There was discovery provided. There were the letters from the counsel. Everything was very focused on Sunpro and Sunpro's relation, and that's kind of consistent with the original theory that was advanced in the coverage case, which was that the policies should have been reformed to add Sunpro. But, again, that was abandoned, and we didn't insure Sunpro. Sunpro had its own carrier, so that's why. In that record, was there any discussion about Harford's coverage? In what record, Your Honor? I'm sorry. You're talking about in the depositions. Do they talk in the depositions about whether there was insurance for the rental business or whether the rental business conducted any of those kinds of facts? There's no reference in anything provided to Harford to the rental property business as some kind of a target for liability or having anything to do with the event. No, there's nothing. Unless the Court has anything further, I would conclude my report. I don't believe we do. Thank you very much. Rebuttal, then. Briefly, I'd like to touch upon a few issues that were raised. Harford is not relieved of its duty to investigate based upon what was provided in the tender. The focus in the tenders were on Sunpro and demonstrated that a business was being run out of the Cibola Court property. All Harford had to do was ask about the rental property business. Where was its base of operations? It never asked that simple question. The documents and discovery that were before the Court were However, Gunderson's pretty straight. That's why I quoted it to you. If, in fact, we determine that Harford lacks potential liability under the allegations of the complaint and the extrinsic evidence, it seems that Gunderson says that they have no duty to further investigate the claim. But what is that set of extrinsic evidence? My point is they can't turn a blind eye and not ask the question. That's why I got the extrinsic evidence out front of us. Sure. We got the depositions, we got the letters, and we've got the complaint. I don't know what else there is. The focus on that was on Sunpro and what Sunpro's capacity is. No, no. I'm just saying what was the extrinsic evidence? And I've looked at all that extrinsic evidence to try to determine if there's any further duty to investigate. I didn't even find Harford or even the business Harford insures even involved in that extrinsic evidence. It was all about Sunpro. If I could respond, Your Honor. You can. That's what I want you to tell me. My point is that set of extrinsic evidence, though, does not get Hartford off the hook from conducting its own reasonable investigation. That's not what Gunderson says. But in addition to Gunderson, Your Honor, there's also authority, and we cite it in our briefs, that if you do not conduct a reasonable investigation and facts could be easily attained through that investigation, then you're charged with what those facts would reveal. And that would be part of the extrinsic evidence that Hartford should have considered. That's not what Gunderson says. Gunderson says, and I quote again, Once an insurer determines on the basis of the complaint and the facts known at the time of the tender there was no potential for coverage, the insurer does not have a continuing duty to investigate or monitor. And what I would say to you, Your Honor, is the facts known at that time also have to include a reasonable duty to investigate. But you're going directly contrary to what Gunderson says, aren't you, Counsel? No, it's not contrary. I think it's in addition to Gunderson. Because I think what I hear the Court saying is these are the set of facts that are known, and what I'm saying is but you can't turn a blind eye to issues and facts that would be easily attained through reasonable investigation. And if you do, then you're charged with those facts. Here they relied entirely upon what defense counsel tendered to them and didn't ask a simple question about where this business was operated from. Had they done so, they would have found the situation was exactly like Sunpro. I understand your argument. I think we have your point. Any of my colleagues have anything further? Thank you both for your arguments. The case that's argued is submitted.
judges: Lamberth, Smith, Smith